UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.: 22-cr-10274-DJC |
| | ) | |
| v. | ) | |
| | ) | |
| FRANK LOCONTE, | ) | |
| Defendant | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM
AS TO FRANK LOCONTE**

Pursuant to the Court's Procedural Order (Docket No. 58), the United States submits this Sentencing Memorandum to address the application of the United States Sentencing Guidelines and the various sentencing factors under 18 U.S.C § 3553. As set forth below, the government recommends that defendant be sentenced to 46 months of imprisonment; restitution in the amount of $3,035,648 to the IRS; $596,462 to NER/NEM; and $1,094,504 to the Benefit Funds; 36 months of supervised release; a $200 special assessment; and a fine at the discretion of the Court. This sentence is sufficient, but not greater than necessary, to comply with the purpose of the sentencing guidelines. The government's reasons for recommending such a sentence, pursuant to the goals enumerated in U.S.S.G. § 3553(a), are set forth below.

**The Facts**

Between January 2014 and May 2022, defendant engaged in a scheme to defraud the Benefit Funds (as defined in ¶ 5 of the Indictment) and the IRS by paying certain of its union workers for overtime hours worked without reporting these hours to the Benefit Funds and without making the required payroll tax withholdings and payments. At times, some NER employees were paid entirely in cash for overtime hours worked and, at other times, the

1

employees were paid by check without the required withholdings ("non-payroll checks").   To facilitate this scheme, defendant caused certain NEM employees to cash NER checks at NER's bank and thereafter distribute the cash payments to the NER employees for the overtime hours worked without making the required tax withholdings. Defendant caused NER to pay NER's employees in cash or with a non-payroll check, in order to, in part, knowingly and falsely underreport its employees overtime hours, thereby avoiding making hourly wage and benefit fund payments required by the CBAs.

In addition, defendant directed and assigned office employees to prepare and file IRS Forms 941 for tax years 2016 through 2021 on behalf of NER and NEM.   However, he deliberately failed to report to the IRS the off-the-books wages, bonuses, and vehicle expenses he caused to be paid to NER and NEM employees, as required.   Defendant was well aware that for each calendar quarter reported on the Forms 941, the actual total employees' wages subject to withholding were in amounts substantially greater than reported, upon which there were additional employment taxes due and owing to the United States.

Moreover, from April 2021 through March 2022, defendant caused NER to withhold trust fund taxes from the paychecks of NER's employees and reported the withheld taxes on filed Forms 941 as required.   However, defendant failed to pay over to the IRS the full amount of trust fund taxes withheld from NER's employees totaling over $2 million. Instead, from January 2014 to December 2021, defendant used NER monies to purchase and pay for various personal expenses, including vehicles, personal property taxes for houses in Beverly, Ipswich, Andover, Massachusetts, Naples, Florida, household improvements, and golf club memberships, and failed to report these benefits to the IRS, as required by the IRS.

**The Guideline Calculations**

## I.    Loss Amount

Defendant pled guilty to a payroll scheme involving mail fraud and failure to pay taxes. Although the government and defendant agree that defendant failed to make contributions to the Benefit Funds as required and failed to pay over taxes to the IRS, we disagree as to the total amount of loss. Here, the guideline provisions for both purposes of where defendant falls within the guidelines and restitution are driven by the loss amount.[1]

Since the parties are not in agreement as to the loss amount, the Court must make a determination pursuant to Rule 32 of the Rules of Criminal Procedure as to the disputed amount. The government bears the burden of proving the loss amount by a preponderance of the evidence, see 18 U.S.C. § 3664(e). The government attaches to this sentencing memorandum several affidavits. Exhibit 1 addresses the loss to the Benefit Funds while Exhibit 2 addresses the tax loss. Both affidavits address defendant's objections to the Presentence Report (See, Exhibits 1 and 2).   Exhibits 3, 4, and 5 are affidavits from NERs Assistant Controller Bonnie Riley, Senior Vice President Fred Pantano, and Chairman of the Board of Directors, John Bosen, respectively, which address the abuse of trust enhancement and overall sentencing factors.   Accordingly, the government has met its burden of proof and, therefore, an evidentiary hearing is not necessary.

In the plea agreement, the government took the position that defendant's base offense level for Count One (7) is increased by 18 because the total loss amount is more than

---

[1] As the Court is aware, the government did not have the benefit of reviewing the final PSR prior to the filing of this sentencing memo.

$3,500,000 but not more than 9,500,000 (USSG § 2B1.1(b)(1)(J)), and accordingly, defendant's total "Offense level" under the Guidelines is 23. However, the government believes it incorrectly used the entire loss amount, for both the Title 18 and Title 26 counts of conviction, to calculate the guidelines for Count One.   The government believes that, for Count One, only the loss amount attributable to the Title 18 violation ($1,094,504) can be used, which increases the offense level by 14, not 18, because the loss is more than $550,000 but not more than $1,500,000 (USSC § 2B1.1(b)(1)(H) and, accordingly, defendant's base "offense level" for Count One is 21.

The government's position with respect to the base offense level for Count Two of 24 is correctly stated in the plea agreement. The total tax loss for sentencing is $3,842,680. However, as will be explained in further detail in ¶ 9 of the affidavit of Internal Revenue Agent ("IRS") Colleen Ranahan ("Ranahan Affidavit), because the IRS, in November 2023, applied a $596,452 Employee Tax Credit to NER/NEM's tax liability, restitution to the IRS is now $3,035,648 and $596,462 to NER/NEM.[2]

### (a) Loss to the Benefit Funds

The loss amount to the Benefit Funds was determined as set forth in the attached affidavit with attachments as submitted by Department of Labor ("DOL"), Employee Benefits Security Administration ("EBSA") Auditor Christian Ruehrwein ("Ruehrwein Affidavit"). *See Exhibit 1.* The government has produced for the defendant and reproduced, upon request, all of the underlying documents which were reviewed by Auditor Ruehrwein and used to calculate the loss amount to the Benefit Funds.

---

2 An additional $210,570 is the tax loss to the Massachusetts Department of Revenue.

Defendant argues in his objections to the PSR that the Bricklayers were no longer part of the Flowers program around 2018 or 2019 and therefore $367,775 should not be included in the loss calculation for the Bricklayers. Determining the exact loss for each benefit fund was complicated by the fact that both Laborers and Bricklayers, at various points in time, received cash.   However, in his objections to the PSR, defendant asserted that the Bricklayers, starting in 2018, did not receive cash.   The remaining "Office Staff Cash" is thus attributable to the Massachusetts Laborers Benefit Funds ("MLBF").   Therefore, the loss amount to the MLBF is $823,774 and the loss amount to the Bricklayers is $270,730.   The government is aware that with this change in attributions, the loss to the MLBF is now larger than the MLBF settlement amount with NER, but that is not surprising given that the MLBF did not have access to the same information as the government when it was calculating the loss from the cash payments to the employees.

Defendant also objects to the inclusion of a number of round dollar figure checks into the loss calculation, particularly those from 2021 forward.   For the most part, as explained in the Ruehrwein Affidavit, DOL did not include checks for amounts of $3,000 or numbers divisible thereto, because DOL had evidence that checks for those amounts were cashed and given directly to defendant for his own use. However, DOL did include a handful of those checks in the total loss amount because DOL had evidence that these checks were believed to have been cashed for the "Flowers" program.   In the year 2021, there were 11 such checks totaling $46,000 (in amounts of $3,000, $4,000, $5,000, and $6,000) that were included in the loss total.   Even if defendant were able to offer proof that there was some legitimate purpose for the $46,000 in cash that came from the checks in question, other than as off-the-books wages for overtime worked by

employees under the Flowers program, the loss would only be reduced by approximately $33,800.

Defendant objects to DOL's use of the $40 per hour rate to determine the number of hours worked for overtime, rather than $50 per hour that the Bricklayers received pursuant to the "Flowers" program.   DOL actually took a conservative route to determining the loss amount by using the $40 an hour rate.   While it's true that when the whole numbers are divided by 40, it produces a larger potential number of hours worked, it is also true that the hourly contribution rates for the Bricklayers are larger than for the MLBF which results in a lower loss calculation. For example, if you have a check in the amount of $400 and divide it by $40/hour, the result is 10 hours worked.   When multiplied by the 2019 MLBF hourly contribution of $27 per hour, there is a loss calculation of $270.   If you take that same check for $400 and divide it by $50/hour, there is a result of 8 hours worked.   When multiplied by the 2019 Bricklayers hourly contribution of $35 per hour, the loss is $280 - a loss amount of $10 more.   Further, in 2017, the difference between the hourly contribution rates was even greater with nearly $10 per hour difference between the MLBF and Bricklayer hourly contribution.   In other words, the government took a conservative approach with its calculations which inured to the defendant's benefit and reduced the total loss amount attributable to defendant.

### (b) The Tax Loss

The total tax loss for sentencing purposes is $3,842,680.[3]   The tax loss was calculated by IRS Agent Colleen Ranahan as set forth in the Ranahan affidavit. *See* Exhibit 2.   The

---

3   Included in this amount is the $210,570 loss to the Massachusetts Department of Revenue which cannot be applied under the Title 26 charge; however, that amount may be considered as relevant conduct under the Title 26 charge since it was reasonably foreseeable that defendant's

government produced to the defendant and reproduced, upon request, all of the underlying

documents which were reviewed by and used by Agent Ranahan to calculate the tax loss amount.

     With respect to the tax loss, $2,030,252.98 of the total amount cannot be disputed as it is

based on NER/NEM's filed (but not paid) Form 941's. Defendant caused the filing of

NER/NEM filed Form 941's for the fourth quarter 2020 through the first quarter of 2022 but did

not pay these taxes in full. *See,* Exhibit 2, paragraph 6.   This is the conduct specifically

addressed in Count Ten of the Indictment to which defendant pled guilty. *See,* ¶'s 21 and 30 of

the Indictment.   The additional tax loss amount totaling $3,842,680 is set forth in further detail

in the Ranahan Affidavit, Exhibit 2.

     In his objections to the PSR, defendant objected to the time period used by the

government and Probation in its loss calculation.   However, the Indictment, ¶'s 21 and 30,

alleging the tax violation to which defendant pled guilty is for the 2021-2022 time period, and,

therefore, defendant's argument that the conduct falls outside the scope of the indictment is

wrong.

     Defendant also erroneously argues that the tax loss should be reduced because payment

was deferred as part of the PPP program. This is also not true.   Defendant raised this claim over

a year ago and has never produced any evidence that NER was eligible to receive such a

deferment or ever applied for one.   NER was not eligible.   Moreover, the CARES Act allowed

businesses who met certain criteria to defer the employer's portion of the Social Security tax

---

payroll scheme would cause taxes to be due and owing to the State of Massachusetts. A court
may include state tax losses in the tax loss computation if the state tax loss constitutes relevant
conduct under Section 1B1.3. *See, e.g., United States v. Yip,* 592 F.3d 1035, 1039-40 (9th Cir.
2010); *United States v. McElroy,* 587 F.3d 73, 88-89 (1st Cir. 2009).

from March 27, 2020 to December 31, 2020, not the remainder of the payroll tax.   Even if NER

had been eligible for such a deferment, it would only reduce the tax loss by the 6.2% of employer

Social Security payments.   *See,* Exhibit 2, ¶ 4, Ranahan Exhibit.   In addition, had the tax

payments been deferred, which they were not, payment was required to have been paid in two

installments - on December 31, 2021 and December 31, 2022.   No such payments were ever

made.

Similarly, defendant's argument that he is only responsible for the employer's FICA

contribution of 7.6% must fail.   The government's tax loss includes both the employee and

employer contribution because that is exactly what the statute contemplates.   *See,* Exhibit 2, ¶ 3,

Ranahan Exhibit.   The statute provides that a person is required to collect, account for on

quarterly Forms 941, and pay over to the IRS a tax on behalf of *the employees* of NER and

NEM, to wit: the trust fund taxes imposed on the employees of NER and NEM by the Internal

Revenue Code.   A violation of Title 26, USC, Section 7202, includes failure to pay taxes for

employees (or trust fund taxes) as well as non-trust fund taxes. Defendant pled guilty to this

charge and cannot now try and carve out his responsibility for the employees' portion of the

taxes. Employers, such as defendant, are required to withhold employee FICA and income tax

from the wages paid to their employees, and to pay over the withheld amounts to the United

States. *See*, 26 U.S.C. §§ 3102(a) (imposing on employer duty to collect employee's share of

FICA), 3102(b) (imposing on employer duty to pay over employee FICA), 3402 (imposing on

employer duty to withhold income taxes from employee's wages), 3403 (imposing on employer

duty to pay over income taxes required to be withheld from employee's wages). The employer's

duty to pay the United States the amount that is required to be collected exists even if the taxes

are not actually withheld from the wages of the employee.   In addition, the non-trust fund taxes constitute relevant conduct for a § 7202 conviction, increasing the total tax loss to be considered by the Court.

The government's calculations are reasonable and since defendant has failed to provide his own calculations of the loss amount, other than to generally assert that it is somewhere between $550,000 and $1,500,000, the government's loss calculation should be accepted by the Court.

## II.    Restitution

In a mail fraud case, such as this, restitution is a mandatory component of sentencing. The plain language of the Mandatory Victim Rights Act ("MVRA") requires restitution in cases where there are fraud victims "notwithstanding any other provision of law."   18 U.S.C. § 3663A(a)(1) ("notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to … any other penalty authorized by law, that the defendant make restitution to the victim of the offense") (emphasis added).   The MVRA requires that victims be compensated "the full amount of their losses as determined by the court and without consideration of the economic circumstances of the defendant."   18 U.S.C. § 3664(f)(1)(A).

In the restitution context, the First Circuit, in *United States v. Gonzalez-Calderon,* 920 F.3d 83, 85 (1st Cir. 2019), held that generally, a restitution order pursuant to the MVRA is proper if it is "record-based and constitutes a fair appraisal of [the victim's] actual losses." *United States v. Gonzalez-Calderon*, 920 F.3d 83, 85 (1st Cir. 2019) (quoting *United States v. Naphaeng,* 906 F.3d 173, 182 (1st Cir. 2018)). Although the government bears the burden of

establishing the restitution amount, see 18 U.S.C. § 3664(e), "[a] district court's calculation of restitution is not held to standards of scientific precision," but rather requires only "a rational basis in the record." *Gonzalez-Calderon*, 920 F.3d at 85 (internal quotations and citations omitted); *see also Naphaeng*, 906 F.3d at 179 (restitution award may be supported by "a modicum of reliable evidence"). Further, the district court may make "a reasonable determination of appropriate restitution by resolving uncertainties with a view towards achieving fairness to the victim," *United States v. Alphas*, 785 F.3d 775, 787 (1st Cir. 2015) (quoting *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005)).

In *United States v. Kearney*, 672 F.3d 81, 100 (1st Cir. 2012), the court held that in calculating the dollar figure owed in restitution the court need only make a "reasonable determination of appropriate restitution." *United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir.2008) (quoting *United States v. Vaknin,* 112 F.3d 579, 587 (1st Cir.1997)) (internal quotation marks omitted). "Absolute precision" is not required. Id. (quoting *United States v. Burdi,* 414 F.3d 216, 221 (1st Cir.2005)) (internal quotation marks omitted). Moreover, the district court has leeway to "resolve uncertainties 'with a view towards achieving fairness to the victim.' " *Id.* (quoting *Vaknin*, 112 F.3d at 587).

In the instant case, for Count One, the amount of restitution is the same as the loss amount. Mandatory restitution is required on Count One for the $1,094,504 loss to the Benefit Funds and Bricklayers under the Mandatory Victims Restitution Act ("MVRA"). 18 U.S.C. § 3663A. Thus, the Court should order restitution to the Benefit Funds of $1,094,504.

For the tax count, the amount of restitution is not the same as the loss amount.   The government submits that the restitution amount for Count Ten is $3,035,648 payable to the IRS;

and $596,462 payable to NER/NEM (for the Employee Tax Credit applied to NER/NEM's tax liability).

Defendant should also be ordered to pay $596,462 to NER/NEM.   As explained in the Ranahan and Bosen Affidavits, Exhibits 2 and 5, respectively, the IRS civil division applied this credit to NER/NEM's unpaid payroll taxes even though it had never assessed those taxes against NER/NEM, and they were unaware that the IRS criminal division had determined that defendant was the sole responsible party for the non-payments in this case. This has caused significant harm to NER/NEM for which defendant is responsible. Where money due NER/NEM was paid to the IRS (victim) for the same loss covered by the indictment, restitution should be paid first to NER/NEM under 18 U.S.C. 3664(j)(1) before restitution is made to any other party, including the IRS. *See*, 18 U.S.C. § 3664(j)(1)

(j) (1) If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

As previously mentioned, there is an additional $210,570 loss to the Massachusetts Department of Revenue which cannot be applied under the Title 26 charge; however, that amount may be considered as relevant conduct under the Title 26 charge since it was reasonably foreseeable that defendant's payroll scheme would cause taxes to be due and owing to the State of Massachusetts. A court may include state tax losses in the tax loss computation if the state tax loss constitutes relevant conduct under Section 1B1.3. *See, e.g., United States v. Yip*, 592 F.3d 1035, 1039-40 (9th Cir. 2010); *United States v. McElroy*, 587 F.3d 73, 88-89 (1st Cir. 2009).

### III.    Abuse of Trust

As described below, the government agrees with Probation that the 2-level enhancement for Abuse of Position of Trust (U.S.S.G. § 3B1.3) is appropriate here.[4]    Defendant's offense level should be increased by two because the government has shown by a preponderance of the evidence that defendant occupied a position of trust in a manner that significantly facilitated the commission or concealment of the offense. *See, USSG § 3B1.3; See, United States v. Sicher,* 578 F.3d 64 (1st Cir. 2009*).    See also,* Exhibits 3 and 4, respectively the Affidavits of Bonnie Riley ("the Riley Affidavit") and Fred Pantano ("the Pantano Affidavit").    Defendant committed his crimes as a result of his abuse of multiple positions of trust as the only corporate officer and president of NER; the only director of NER; the sole, controlling shareholder of NER; and sole trustee of the 2009 Richard Sylvester, Jr. Revocable Trust (the "Trust").

Courts apply the abuse of position of trust enhancement where a defendant uses his position of trust or special skill "in a manner that significantly facilitate[s] the commission or concealment of the offense." *Id.*   The government has the burden of proving by a fair preponderance of the evidence that section 3B1.3 applies in a given case.    *See United States. V. Tardiff*, 969 F.2d 1283 (1st Cir. 1992).    A sentencing court engages in a two-step analysis when assessing whether to apply the abuse of position of trust enhancement.    *See United States v. Parrilla Roman,* 485 F.3d 185, 190 (1st Cir. 2007).    First, the court determines whether the defendant occupied a position of trust.    If the answer is no, the inquiry ends.    If the answer is yes, the court then determines whether the defendant used that position to facilitate significantly

---

4 The government believes that the abuse of trust enhancement should be applied to Count One and not Count Ten. Defendant occupied a position of trust with respect to NER, its shareholders and employees, and the Trust. Less clear is application of the abuse of trust enhancement to the tax count (Count Ten) and defendant's position of trust with respect to the IRS.

the commission or concealment of the offense. *Id*. The result of this two-step analysis in this case requires that the Court apply the enhancement.

The Application Notes to U.S.S.G. provide that a "public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.   For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense.

The facts herein demonstrate that defendant occupied multiple positions of trust which he abused.   First, defendant owed a duty of trust to NER, its shareholders, and its employees. During the relevant time period, NER was 60% owned by the Sylvester Trust, of which defendant was sole trustee, and 40% owned by defendant was the sole trustee. Defendant was the president and sole director of NER/NEM. As trustee, as president, and as 40% owner of NER, defendant exercised significant control over the financial affairs of NER/NEM including by, among other things, approving payments, signing checks, and controlling bank accounts; thus, he was a responsible person for collecting trust fund taxes, accounting for the employment taxes by filing Forms 941 with the IRS, and paying over to the IRS the employment taxes for NER and NEM's employees.

As an officer or director of NER, defendant owed a duty to the corporation and its shareholders to take all actions consistent with proper management.   NER and its shareholders trusted that defendant would collect and pay over to the IRS the employment taxes for NER and

NEM's employees.   They trusted that he would make the appropriate contributions to the employees benefit funds.   He abused that trust.

The trust inhered in the relationship between defendant and his employees because of his responsibilities at NER/NEM.   Defendant owed a duty to his employees, which included ensuring that appropriate contributions were made on their behalf to the Benefit Funds.[5]  NER's employees trusted that defendant would forward accurate remittance reports tallying their overtime hours to the Benefit Funds to ensure that they would receive the fringe benefits they were entitled to under the collective bargaining agreements.   He breached that duty.   These employees trusted that defendant would collect trust fund taxes and account for the employment taxes by filing Forms 941 with the IRS. And he breached that duty as well.

Not only did defendant's position at NER/NEM contribute in a significant way to facilitating the commission of the offense but it contributed to concealment of the offense by making the detection of the offense or the defendant's responsibility for the offense more difficult. The issuance of non-payroll checks to employees for their overtime hours and raises, which he accounted for by misclassifying them as vendor expenses (and vehicle expenses), with no taxes deducted, was a way for defendant to avoid detection and conceal his crimes. At least eleven employees received vehicle expenses in lieu of raises as a way for defendant to conceal the income and avoid the payment of payroll taxes.

---

5 On or about September 18, 2003, NER signed an Acceptance of Agreement(s) and Declarations of Trust ("Acceptance of Agreement") in which it agreed to be bound to the terms of collective bargaining agreements requiring contributions to the Benefit Funds.

There is no dispute that defendant was NER/NEM's only officer, member, and sole director. Defendant alone decided how to use NER/NEM's money; namely, to pay himself and parties other than the Benefit Funds and IRS. Defendant's role as co-owner and officer with responsibilities over NER/NEM's finances and payroll contributed to him facilitating his embezzlement and enabled him to escape detection.   He was subject to little to no supervision over moving NER/NEM's finances, handling payroll, and managing the company's books. *See* Exhibit 3, the Riley Affidavit.   Defendant had free rein, by virtue of his position, to avoid detection and he did so by cooking the books.

Defendant ran the day-to-day operations of NER/NEM and, according to numerous witnesses, nothing was done at NER/NEM without defendant's express approval. He had substantial managerial discretion over the finances of NER/NEM.   There was no one supervising defendant's actions and he had full discretion over those actions. In the Riley Affidavit, Exhibit 3, NER Assistant Controller Bonnie Riley characterized defendant as a "control freak" and stated, that

> "Mr. Loconte exercised complete and exclusive control of NER's finances. Mr. Loconte controlled all of the NER bank accounts. I could not issue a check for any purpose unless I was permitted to do so by Mr. Loconte. Mr. Loconte was the only individual who was allowed to sign any checks issued by NER… In every instance during my employment, any payroll at NER was done so at the direction of Mr. Loconte.   In every instance during the time of my employment, the timing and amounts paid to the laborers funds was determined by Mr. Loconte."

Similarly, in the Pantano Affidavit, Exhibit 4, Senior Vice President Pantano stated that,

> "During my work at NER with Mr. Loconte, he exercised complete control over the business operations of NER, including all company finances, payroll, insurance, and union issues and decisions.   No other persons or employees that I observed had any input into those decisions."

The fact that under prior ownership of NER, the company engaged in a similar fraudulent payroll scheme is of no moment. Indeed, defendant had actually run the business since at least as far back as 2009 and had over a decade to put an end to these illegal practices yet, because they benefitted him personally, he chose not to. The prior owner, Richard Sylvester, Jr., died on or about January 10, 2013. Defendant was listed as every corporate officer starting in 2014.   The losses to the Benefit Funds and IRS do not even include the time period that Sylvester was involved with NER.

Moreover, multiple employees and outside consultants/accountants reported that defendant did nothing to change the practice once Sylvester died. Witnesses stated that because Sylvester had a serious drug addiction in the years prior to his death defendant actually ran the day-to-day operations of NER. Again, even if defendant inherited a business engaged in fraud he chose not to put an end to these illegal practices and, in fact, for well over a decade, personally benefitted from the fraud.

Defendant also had a duty to the Sylvester Trust which he breached.   Defendant was the sole trustee of the Trust with all of the authority to control the Trust. Surely, the sole trustee of a trust that owns 60% of a company, where the trustee owns the other 40%, owes a fiduciary duty to its beneficiaries to take all actions which are consistent with proper management of the company. As the controlling shareholder of NER, defendant was vested with the express power to control NER under the terms of the Sylvester Trust.[6] As sole trustee, defendant had a fiduciary

_____

6   Upon the death of Richard Sylvester, defendant became the sole trustee of the Trust.   At the time, the Trust owned 100% of the shares of NER.   As a condition of remaining at NER and serving as president, defendant caused the Trust to transfer to him 40% percent of the NER shares in 2013. As a result, defendant personally owned 40% and the Trust owned 60% of NER. *See* Exhibit 5, ¶ 7, Bosen Affidavit.

duty to its beneficiaries (the Sylvesters) and was responsible for the actions of the Trust in running NER/NEM.   The Trust document itself granted defendant broad powers to run every aspect of NER as Trustee in addition to his complete control of the NER shares held in the Trust. *See* Exhibit 5, Affidavit of John Bosen ("the Bosen Affidavit").

   While it is true that the three Sylvester children worked for NER/NEM, two of them had very minor roles.   The youngest, Jackson Sylvester, was 16 when his father died. Jackson was a Bricklayer although there is no evidence that he received any cash overtime payments nor is there is any evidence that he was involved in the filing of false remittance reports or fraudulent IRS Form 941's. Carina Sylvester was 19 when her father died. She was a Purchasing Assistant for NEM. There is also no evidence that she was involved in the filing of false remittance reports or fraudulent IRS Form 941's.

   The eldest son, Nicholas Sylvester, was 21 years old when his father died.   At NER/NEM, he was affectionately known as "the kid."   He worked as a field superintendent and, at defendant's direction, cashed some of the NEM checks and distributed the cash or non-payroll checks to those employees being paid under the table for overtime. However, there is no evidence that Nicholas Sylvester had any knowledge that the overtime hours were not being reported to the Benefit Funds, or that the remittance reports were false, or that NER had not paid payroll taxes.   Moreover, there is ample evidence that Nicholas Sylvester was given little to no authority by defendant. He did as he was told and was shut down any time he attempted to question defendant or act on his own accord.   In the Riley Affidavit, Exhibit 3, Ms. Riley succinctly stated, "Mr. Sylvester had no control whatsoever over NER's finances. Everything was done at Mr. Loconte's direction."   And in the Pantano Affidavit, Exhibit 4, Mr. Pantano

stated that, "Mr. Sylvester had no control over or input into NER's business operations such as company finances, payroll, insurance, and union issues and decisions."   *See,* Exhibits 3 and 4, the Riley and Pantano Affidavits.

Indeed, under the terms of the Trust, the beneficiaries had no right to remove defendant as trustee, with or without cause, giving him total authority over the Trust and its actions.   *See,* Bosen Affidavit, Exhibit 5, ¶ 7.   The payroll scheme and Flowers program may have been Nicolas Sylvester's father's creation but defendant was the captain at the helm and never sought to right the ship even a decade after Richard Sylvester's death.

Defendant has argued in the PSR that the payroll scheme was no secret so no trust could have been breached.   However, contrary to what defendant suggests, the abuse of trust enhancement does not require a person in a position of private trust to conceal the offense from everyone, only that it significantly facilitates concealment, which occurred here.   *See, United States v. Bartleson,* 74 D. Supp.3d 97 (N.D. Iowa 2015).   The fact that defendant's payroll scheme was no secret or that defendant may have inherited the bad business practices of the former owner, Richard Sylvester, Jr., who also paid his employees overtime in cash, cannot absolve defendant of criminal responsibility or an abuse of trust sentencing enhancement.

While the payroll scheme may have been well known, countless witnesses, including union members, NEM employees, and outside accountants and consultants, told the government that they complained frequently to defendant about the off-the-books payroll scheme and told him to stop.   Defendant either told them flat out to "shut up" or told them they could find another job if they did not like it.   These witnesses explained that because of defendant's position, there was nothing they could do to stop him from continuing to engage in this criminal

conduct.[7]   These individuals had no choice but to defer to defendant.   The Application Note to § 3B1.3 was written precisely for this situation and specifically defines a position of trust as one having *substantial discretionary judgment that is ordinarily given considerable deference.*

For further elucidation of defendant's breach of fiduciary duty owed to NER/NEM and the Trust, attached as Exhibit 6 are two civil complaints filed against defendant by NER/NEM and the Trust in January 2023 in Suffolk Superior Court.   These complaints allege, among other things, Breach of Duty and Diverting Corporate Assets.   These claims address much of the very same conduct that is the subject of the instant criminal action. Since defendant abused multiple positions of trust that he owed, the two-level enhancement should apply.

Finally, although defendant technically was not a fiduciary of the Benefit Funds, his actions harmed the Benefit Funds who relied on defendant to submit accurate remittance reports in order that contributions could be accurately apportioned to the various benefit funds and District Council for dues. The government has met its burden of proving by a fair preponderance of the evidence that section 3B1.3 applies, however, should the court disagree all of the above facts should be considered under the § 3553(a) factors.

### IV.   The Counts of Conviction Do Not Group

The two counts of conviction do not group because they concern different victims (USSG§ 3D1.2).   There are multiple victims of defendant's criminal conduct.

The first group of victims are the Benefit Funds. These benefit funds exist to fund health insurance and retirement for hundreds of union members. As set out in the Indictment, the

---

7 Defendant has been provided with all of the ROIs and will be hard pressed to refute this evidence.

following is a list of each benefit fund affected by defendant's payroll scheme: the Massachusetts Bricklayers and Masons Health and Welfare Fund, Massachusetts Bricklayers and Masons Pension Fund, Massachusetts Bricklayers and Masons Annuity Fund, International Union of Bricklayers and Allied Craftsmen Trowel Trades Pension Fund, Massachusetts Laborers' Health and Welfare Fund, Massachusetts Laborers' Pension Fund, New England Laborers' Training Trust Fund, Massachusetts Laborers' Legal Services Fund, Massachusetts Laborers' Annuity Fund, New England Laborers' Labor-Management Corporation Trust, Massachusetts Laborers' Unified Trust, and New England Laborers' Health and Safety Fund (the "ERISA Funds and non-ERISA Funds").

Similarly, the second group of victims is the District Council.   Because defendant falsified the remittance reports, the members hours were not accurately reported to the District Council for those members who were part of the Flowers program. The District Council was therefore shorted of contributions which are made on behalf of the union members.

 Another set of victims include the approximately 66 individual union members who were paid off-the-books for their overtime hours as part of the Flowers program. These members worked overtime hours yet they were not paid at the overtime rate nor were contributions for those hours made to the Benefit Funds or District Council as required under the collective bargaining agreements. Although the total loss amount did not include the wages for these employees that were not paid at the overtime rate, these individuals were nonetheless victims of defendant's crimes.

Finally, the U.S. government (and the State of Massachusetts) are victims of defendant's scheme to defraud the IRS and Massachusetts Department of Revenue.

## V.      DISCUSSION OF SENTENCING FACTORS

A 46-month term of incarceration is sufficient, but not greater than necessary to achieve the goals set forth in 18 U.S.C. § 3553(a). The government recognizes that its recommendation is at the high end of the guidelines.   However, the government believes such a sentence is warranted given that the loss amount does not even include the approximately $925,581 in NER/NEM money defendant used to pay for personal expenses.   Nor does the loss amount include the money defendant failed to pay his employees for their overtime hours at the collectively bargained for rates. This was pure greed which, as discussed below, allowed defendant to live a lavish lifestyle all on the backs of his hard-working hourly wage employees. In 2020 and 2021 alone, he took an untaxed vehicle expense totaling approximately $202,400 in addition to $910,800 in gross payroll. This type of criminal conduct clearly justifies a sentence at the high end of the guidelines.

### A.      The Nature and Circumstances of the Offense

In calculating the sentence to be imposed, a court should consider the seriousness of the offense of which the defendant stands convicted.   *See* 18 U.S.C. § 3553(a) (requiring assessment of the nature and circumstances of a defendant's offense).   Here, the nature and circumstances of the offense driving defendant's sentencing guidelines range are significant.

Defendant pled guilty to one count of mail fraud and one count of failure to collect and pay taxes and admitted that he paid his employees for overtime worked without reporting those overtime hours to the Benefit Funds and without making the required payroll tax withholding and payments.   In addition, defendant failed to pay certain union employees the overtime payments that they were entitled to receive under the collective bargaining agreements to which

21

NER was a party. Year after year, defendant instructed others to generate the cash he needed to pay the cash wages. He caused checks to be prepared for the overtime wages which he instructed NEM employees to cash frequently classifying the payments as vendor payments in order to hide the cash on NER/NEM's books. He caused false remittance reports to be submitted to the Benefit Funds. And he failed to pay over the payroll taxes due and owing to the U.S. government and Massachusetts Department of Revenue.

Defendant committed crimes, not mistakes, and they were not crimes of passion, addiction, or desperation. These were crimes of calculation, driven by greed. There is nothing about the nature and circumstances of the offense – defendant's deliberate violations of the federal tax code and lies to the Benefit Funds – that bring his crimes outside the heartland of the applicable USSG.

The consequences of defendant's crime are significant. The Benefit Funds and District Council were deprived of over $1 million in contributions and dues for its members.   This is money that affects the health, welfare, and pension plans that existed to benefit NER's hardworking employees who were members of the various unions. Moreover, the payroll taxes alone defendant failed to remit were over $3 million. The U.S. government is impacted anytime taxpayers fail to collect and pay over payroll taxes.   Here, over $3 million was not paid by defendant in payroll taxes – hardly an insignificant amount. Moreover, defendant's scheme has exposed NER and its employees to significant tax liability. *See* the Bosen Affidavit, Exhibit 5.

Defendant's crimes also caused substantial harm to both NER and the Trust and left NER in serious financial difficulty.   *See* the Bosen Affidavit, Exhibit 5.   As a result of defendant's malfeasance, NER/NEM was sued by the Massachusetts Laborers Benefit Funds for the unpaid

contributions and forced to settle with MLBF or be shut down.   The MLBF refused to wait until the criminal case concluded and threatened to remove its members from NER which would have effectively shut NER down.   NER therefore had no choice but to settle the lawsuit if it wanted to maintain its labor force.   *See* Bosen Affidavit, Exhibit 5, ¶ 10.

In addition, NER/NEM is now saddled with tax liability caused by defendant's failure to pay in excess of $2 million in payroll taxes. And, in fact, in November 2023, the IRS applied an Employee Tax Credit in the amount of $596,462 due NER against NER/NEM's unpaid payroll taxes which were incurred by defendant. *See* Exhibit 2, the Ranahan Affidavit ¶ 6, and Exhibit 5, ¶ 11, the Bosen Affidavit, for additional details about the credit.   Defendant was clearly the responsible person for payment of NER/NEM's payroll taxes.   NER should not have to pay for defendant's crimes.   Nor should the United States government, which is essentially what has occurred here when the IRS applied the tax credit legitimately owed to NER/NEM to satisfy part of NER/NEM's tax liability which was incurred solely due to defendant's criminal conduct. The government is therefore asking that, as part of its restitution order, defendant be ordered to first reimburse NER/NEM for the $596,492 Employee Tax Credit that the IRS, without knowledge of the criminal proceeding, applied to NER's tax liability before the remainder of the restitution amount is paid to the IRS. But for defendant's fraud and failure to pay NER/NEM's payroll taxes to the IRS, NER/NEM would have received the $596,492 credit and neither NER's shareholders, employees, or the Trust should have to bear the brunt of defendant's misdeeds which served no purpose other than to line his own pockets. *See* Exhibit 5, the Bosen Affidavit.

**B.    The Characteristics of the Defendant**

Defendant has led a charmed life.   He had opportunities that not all defendants enjoy, including a happy family life, a solid education, and the good fortune to essentially inherit an already established business that enabled him to make an extremely profitable living for years before he was ultimately terminated.

Defendant's true colors were shown when he clearly had the money to pay the full payroll tax due and owing to the IRS for 2020 through 2021 yet instead paid himself a high salary and large untaxed vehicle expenses.   In 2020 and 2021 alone, defendant spent at least $262,000 of NER money on personal expenses. As evidenced by the vendor reports, he ran many of these personal expenses through the company as vendor expenses, including property taxes, personal vehicles, household improvements, cars for his wife and girlfriend, and golf club memberships.[8]   His scheme allowed defendant to lead a "lavish lifestyle," as described in the Bosen Affidavit, Exhibit 5, ¶ 8, and to "bleed the estate and NER dry of its assets," all while concealing income from the IRS so as to avoid having to pay taxes on this money.

On one occasion, in October 2021, defendant wrote a check for $1,725,000 out of his personal bank account and used this money to help pay for a $2,850,000 home in Beverly he was purchasing. During the relevant time period he also owned and paid for renovations to his multi-million-dollar vacation homes in Naples, Florida and Kennebunkport, Maine. In 2020 and 2021, defendant received an untaxed vehicle expense totaling approximately $202,400. During the same time, defendant also received $910,800 in gross payroll.   The PSR further describes the

---

8 After reviewing NER's vendor reports and based on interviews with numerous individuals associated with NER/NEM, including controllers, an assistant controller, accounts payable and accounts receivable workers, and accountants, the IRS has determined that defendant's personal expenses, in addition to his salary, from 2016 to 2021 was approximately $925,581. This number was not included in the total loss amount.

multiple cars and property owned by defendant.   *See*, PSR ¶ 108.   Over the course of the same time period, NER failed to pay both the trust fund and non-trust fund employment taxes that were reported on NER's 941s in an amount in excess of $2 million.

Defendant knew what he was doing when he repeatedly underreported hours to the Benefit Funds in order to avoid paying taxes and fringe benefit contributions to the Benefit Funds. Yet rather than remit payroll taxes he owed; defendant spent the money buying luxury items for himself.   Several employees complained that they did not want to be part of defendant's Flower program – they knew these off-the-books payments were wrong. Yet, defendant told them they did not have to work overtime or they could leave.   These were largely hard-working individuals who desperately needed the work to provide for their families. Defendant was also repeatedly warned about this illegal payroll practice by multiple people, both NEM employees (several different controllers) as well as outside accountants and consultants. He was told that what he was doing was wrong and that he had to stop.   *See,* PSR ¶ 38, and Exhibit 3, the Riley Affidavit.   Indeed, it was not until a payroll assistant who had only worked at NER for a few weeks made a complaint to the Massachusetts Attorney General's Office, and the issuance of federal grand jury subpoenas, that defendant discontinued his illegal payroll scheme. .Defendant knew right from wrong.   His knowing and willful conduct merits the government's recommended sentence.

### C.    Specific and General Deterrence

A court should consider specific and general deterrence when imposing a sentence.   *See* 18 U.S.C. § 3553(a)(2)(B), (C) (the district court may impose a sentence "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant").

Deterrence will be a critical component of whatever sentence the Court decides to impose in this case.   Defendant – and other corporate officers like him must understand that this type of criminal conduct has serious consequences.

As is true with most tax offenders, there is perhaps a minimal need for a sentence to provide specific deterrence for a defendant. However, it is the general deterrent effect of punishment which requires a sentence of imprisonment in tax cases and cases involving fraud on union benefit funds. The income tax system in the United States is grounded in voluntary compliance, and taxpayers must know that they will be punished according to the law if they lie to avoid their tax obligations. The same is true for the Benefit Funds; signatory contractors must know they will be punished if they lie about their company's wages on remittance reports in order to avoid paying the benefits due and owing on those wages. The public must know that if you violate the tax and reporting laws, you go to prison. If the price of lying about your payroll on your corporate tax returns and in your remittance reports is to just pay back the money and continue on with your professional and personal life, the deterrent effect is questionable.

Achieving general deterrence for the type of conduct defendant engaged in is imperative. A significant sentence is required to deter both defendant and other corporate officers from engaging in the conduct that led to the charges here.

## CONCLUSION

Considering the Section 3553 factors, including the nature and circumstances of the offenses of conviction, and the seriousness of those offenses, the following sentence is sufficient, but not greater than necessary:

- 46 months' incarceration;

- 36 months' supervised release;
- $823,774 restitution to the MLBF;
- $270,730 restitution to the Bricklayers;
- $596,462 restitution to NER/NEM;
- $3,035,648 restitution to the IRS; and
- A mandatory special assessment of $200.

Respectfully submitted

JOSHUA S. LEVY,
ACTING UNITED STATES ATTORNEY

Date:    January 9 , 2024           By:    */s/ Laura J. Kaplan*
LAURA J. KAPLAN
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Date:    January 9, 2024           */s/ Laura J. Kaplan*
Laura J. Kaplan
Assistant United States Attorney